IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 )
                                    )      No. 11-CR-20192 Ml/P
EARL BRADEN,                        )
                                    )
        Defendant.                  )

---

## REPORT AND RECOMMENDATION

---

Before the court by order of reference is defendant Earl Braden's Motion to Suppress, filed on May 13, 2012. (ECF No. 498.) On June 25 and June 28, 2012, the court held a suppression hearing.[1] Present were Assistant U.S. Attorney David Pritchard, defense counsel K. Jayaraman, and defendant Earl Braden. The court heard testimony from Drug Enforcement Administration ("DEA") Agent John "J.T." Scroggs, Shelby County Sheriff's Office ("SCSO") Deputy Jeff Kemp, and Memphis Police Department ("MPD") Officer Jason Moore. The court received as evidence two exhibits: a dashboard video-audio recording of the traffic stop of Braden's vehicle that took place on July 9, 2011, and a two-page SCSO arrest report from the July 9 arrest of Braden.

For the reasons below, it is recommended that Braden's Motion

---

[1]The suppression hearing was originally scheduled for June 5, 2012, but was continued at Braden's request to June 25.

to Suppress be denied.

## I. PROPOSED FINDINGS OF FACT

The court has carefully considered the evidence presented at the hearing, including the witnesses' demeanor as they testified. The court finds the government's witnesses to be credible, and therefore adopts their version of events as its findings of fact.[2]

DEA Agent John Scroggs first became aware of Earl Braden in or around May 2008, when he was asked to assist in a drug investigation in the Atlanta, Georgia area involving a narcotics organization headed by an individual named Vernon Taylor. Information obtained from an investigation indicated that marijuana was going to be transported to a warehouse in a tractor trailer by members of Taylor's organization. Agent Scroggs conducted surveillance of the tractor trailer and observed an individual, later identified as Earl Braden, unloading boxes from the trailer to a vehicle registered to Braden. Braden was observed driving the vehicle to a rental house associated with Taylor.

In 2011, the DEA began an investigation involving marijuana trafficking by Taylor's organization in the Memphis, Tennessee area. The investigation involved wire taps, surveillance,

---

[2]In its response brief, the government describes in detail several calls that were intercepted during the investigation. However, the government did not play the recordings of these calls at the hearing or seek to admit the recordings as evidence. Therefore, the court has given no weight to the description of these calls contained in the government's brief. The court's factual findings are based solely on Agent Scroggs's testimony regarding the calls.

telephone toll analyses, and an interview with a confidential informant who was a former member of Taylor's organization. During the investigation, numerous phone conversations between Braden and Taylor were intercepted, which Agent Scroggs believed related to the trafficking of illegal narcotics.

On April 30 and May 1, 2011, agents intercepted calls among members of Taylor's organization that indicated narcotics would be delivered to the Kuehne Nagel warehouse in Memphis (the "Warehouse"). Agents then conducted surveillance of the Warehouse, where they observed a tractor trailer arrive and back up to a loading bay. Although the agents could not see what was happening inside the loading area, they observed pick-up trucks coming and going from the Warehouse. During an intercepted call on May 1, Taylor spoke with a member of the organization, Barry Collier, and discussed the price per pound of the marijuana that was delivered. Taylor also called Tony Stephenson, another member of the organization, and discussed the drugs that had arrived and that the process had gone smoothly. They also discussed whether Taylor had checked the quality of the drugs.[3]

On May 12, 2011, calls were intercepted involving Taylor and members of the organization, in which they discussed another delivery of marijuana in a tractor trailer. Agents conducted surveillance of the Warehouse and observed a tractor trailer arrive

_____

[3]Agents observed Stephenson at the Warehouse on May 1.

at that location.  Agents observed several members of the organization at the Warehouse, and the agents could hear loud noises coming from inside the trailer.  During this time, agents observed Taylor arrive at the Warehouse in a blue Ford F-150 pick-up truck.[4]  After the tractor trailer left the Warehouse, agents followed it to Dyersburg, Tennessee, at which time it was stopped by law enforcement officers.  A search of the trailer uncovered a hidden compartment storing $635,427.00 in cash.

On May 16, 2011, agents intercepted a call between Taylor and Braden, in which Taylor told Braden to meet with Roderick Mathis, another member of the organization, at a house rented by Taylor on Castlegate Street.  Taylor told Braden to go to the house, pick up a vehicle, and make a delivery (believed to be marijuana) to the "Old Man" (believed to be Collier).  Agents observed Braden arrive at the Castlegate residence and leave the location in a truck.  Agents asked MPD officers to conduct a traffic stop of the truck to identify the driver.  Officers ran the license plate information on the truck and discovered that the license plate did not belong to the truck.  Based on this, the officers initiated a traffic stop and were able to identify the driver as Braden.  Afterwards, agents intercepted a call between Taylor and Braden, in which Braden told Taylor about being stopped by the officers.

---

[4]As discussed later, this was the same truck that Braden was driving on July 9, 2011, when he was pulled over by law enforcement.

On June 9, 2011, agents intercepted a call between Taylor and Braden, in which Braden stated that he was ready to "work." Taylor indicated that another shipment would be arriving soon. On June 11, calls were intercepted indicating that tractor trailers would be arriving at the Warehouse. Agents conducted surveillance and observed two tractor trailers arrive at the Warehouse at different times. Braden was seen at the Warehouse while one of the tractor trailers was being unloaded. Agents followed the second tractor trailer to Texarkana, Texas, and during a Level II inspection of the trailer at a weigh station, $998,014.00 in cash was found hidden inside hollow areas of doors that were being transported in the trailer.

On July 9, 2011, agents intercepted calls by members of Taylor's organization which indicated that another shipment of narcotics was going to be delivered to the Warehouse. A call was intercepted between Taylor and Stephenson, in which Stephenson stated that there were 69 "shoulder pads" and asked Taylor how they should be separated. Taylor stated that the packages should be separated according to the initials on the packages. A call was intercepted between Taylor and Braden, in which Taylor told Braden to go to the Warehouse and that they were ready for him.

On that same day, agents conducted surveillance of the Warehouse and observed a tractor trailer arrive and back up to the loading bay. Agents observed Braden arrive in a blue F-150 truck,

which was the same F-150 driven by Taylor on May 12 when he was seen at the Warehouse. Within a few minutes, Braden left the Warehouse. Agent Scroggs initially followed Braden's vehicle from the Warehouse, but then he contacted Deputy Kemp with the Interstate Criminal Interdiction Task Force ("ICI Task Force") and asked for assistance in conducting a traffic stop of Braden's truck.[5] Deputy Kemp was not provided with any specific information about why Agent Scroggs wanted Braden pulled over, but Deputy Kemp believed that the reason was drug related because the request came from the DEA. Assisting Deputy Kemp was MPD Officer Moore (also a Task Force member), who was in a separate police vehicle and accompanied by his narcotics canine.

Deputy Kemp followed behind Braden's vehicle, which was traveling on a street with multiple lanes of traffic. Braden's vehicle was in the right-hand lane. Deputy Kemp observed Braden swerve out of his lane of traffic twice, by crossing over the white "fog" line separating the lane of travel from the shoulder. He also observed that the front passenger's window, which was partially rolled down, had window tint that was too dark, in violation of Tennessee law. Based on these two traffic violations, Deputy Kemp activated his blue lights and initiated a traffic

---

[5]Based on intercepted calls, Agent Scroggs believed that Braden was making a delivery of marijuana to Collier. Braden was later stopped at a location less than one mile from Collier's residence.

stop.[6]  Deputy Kemp approached the driver's side and asked to see Braden's driver's license.  He also asked Braden if the truck belonged to him and if he had "papers" for the vehicle.  Braden handed over his license and insurance card, and stated that the truck belonged to a friend.[7]  As Deputy Kemp was talking to Braden, he detected the smell of alcohol and saw in the front cupholder an open container of beer.  He asked Braden if he had been drinking, to which Braden responded that he had consumed half a cup of beer. Deputy Kemp observed that Braden's hands were shaking and he appeared very nervous.  Deputy Kemp told Braden that he saw him cross over the fog line "a couple of times."  Deputy Kemp directed Braden to step out of the truck, at which time he patted Braden

---

[6]The only material discrepancy in the witnesses' testimony related to whether Deputy Kemp stopped Braden based on a seatbelt violation.  Agent Scroggs testified that he believed Deputy Kemp initiated the traffic stop based on a seatbelt violation, whereas Deputy Kemp testified that he could not see whether or not Braden was wearing a seatbelt.  Deputy Kemp further testified that he pulled over Braden based on the other traffic violations.  On this issue, the court credits the testimony of Deputy Kemp over the testimony of Agent Scroggs, as Deputy Kemp was the officer who actually initiated the traffic stop, and his testimony regarding the basis of the stop is consistent with the video evidence and his arrest report.  Agent Scroggs, on the other hand, was not an active participant in the traffic stop, and thus had no first-hand knowledge of the events surrounding the stop.  Instead, Agent Scroggs followed Deputy Kemp from a safe distance and once he observed Deputy Kemp initiate the traffic stop, Agent Scroggs left the scene and pulled into a gas station to avoid being detected by Braden.

[7]It is undisputed that Braden was not the owner of the truck. However, the government does not challenge Braden's "standing" to challenge the initial traffic stop or search of the vehicle.

down for weapons. After he determined that Braden did not have any weapons, Deputy Kemp placed Braden in the backseat of his police vehicle. According to the elapsed time displayed on the dashboard recording of the traffic stop, Braden was placed in the back of the police vehicle without handcuffs approximately three minutes after Deputy Kemp activated his blue lights and initiated the traffic stop. After Braden was placed in the backseat, Deputy Kemp began running a records check through BLOC, a law enforcement database.[8]

Approximately one minute later, Officer Moore (who was parked behind Deputy Kemp) escorted his narcotics canine, "Nic," to the truck.[9] Within seconds, Nic gave multiple positive alerts to the rear tailgate area of the truck. Nic gave his positive alerts well before Deputy Kemp completed his records check. Over the next several minutes, Deputy Kemp and Officer Moore attempted to access the truck bed by lifting the topper that covered the truck bed. Although the topper was locked, the officers were able to lift the topper slightly and slide a small video camera that was attached to a wire into the truck bed area. The video camera showed packages that appeared to be marijuana inside the truck bed. Afterwards,

_____

[8]Deputy Kemp informed Braden that the insurance card had expired in 2008.

[9]Nic has been certified as a narcotics canine since 2008, and has been recertified each year since then. Nic has been trained to sit when he detects the odor of four types of drugs - marijuana, cocaine, heroin, and methamphetamine. Officer Moore has also received specialized training in the handling of Nic through the MPD.

the officers were able to access the truck bed by pushing up on the topper and pulling down on the unlocked tailgate.[10]  They found twenty-seven packages in the truck bed, totaling approximately 746 pounds of marijuana.  After Braden's truck was towed from the scene, testing was conducted on the window tint, which showed that the tint had a visible light transmittance of 4%, well below the minimum 35% required by Tennessee law.

Braden, along with Taylor, Stephenson, Bowens, Collier, and twenty-one other individuals, were subsequently indicted for conspiring to posses with the intent to distribute marijuana, in violation of 21 U.S.C. § 846.  In the present motion, Braden moves to suppress the marijuana seized from the truck, on grounds that the officers violated his Fourth Amendment rights by initiating the traffic stop without probable cause or reasonable suspicion, and by unreasonably prolonging the stop.

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Whether the Officers Had a Proper Basis for the Stop

"The Fourth Amendment's prohibition against unreasonable searches and seizures by the government extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  United States v. Guajardo, 388 F. App'x 483, (6th Cir. 2010) (internal quotation marks omitted) (quoting United

---

[10]This occurred approximately twenty minutes after Braden was initially stopped.

-9-

States v. Arvizu, 534 U.S. 266, 273 (2002)). "In determining the constitutionality of an investigatory detention under Terry v. Ohio, 392 U.S. 1 (1968), we employ a two-part inquiry that asks whether there was a proper basis for the stop and whether the degree of intrusion was reasonably related in scope to the circumstances of the stop." Id. (citing United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006)).[11] "Although virtually every other circuit court of appeals has held that reasonable suspicion suffices to justify an investigatory stop for a traffic violation, this circuit has required probable cause to justify an investigatory stop for *completed* misdemeanor traffic violations." Id. (emphasis in original) (internal quotation marks omitted) (quoting United States v. Simpson, 520 F.3d 531, 540 (6th Cir. 2008); see also United States v. Jeffries, 457 F. App'x 471, 477 (6th Cir. 2012). However, when the stop is for an *ongoing* violation, no matter how minor, "reasonable suspicion will be sufficient to justify an investigatory stop." Guajardo, 388 F. App'x at 487 (citing Simpson, 520 F.3d at 541); see also Jeffries, 457 F. App'x at 477 (applying probable cause standard to defendant's violation for driving too closely but reasonable

---

[11]Further, "police officers [may] stop vehicles for any [traffic] infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995). "Thus, the officer's subjective intent for executing the stop is irrelevant." United States v. Torres-Ramos, 536 F.3d 542, 550 (6th Cir. 2008).

suspicion standard to defendant's obstructed licence plate violation, because it was an "ongoing" violation that did not cease when defendant was pulled over).

Deputy Kemp stopped Braden's vehicle based on two traffic violations: swerving out of his lane of traffic twice, in violation of Tenn. Code Ann. § 55-8-123(1), and operating a vehicle with window tint that had visible light transmittance of less than 35%, in violation of Tenn. Code Ann. § 55-9-107(a)(1). With respect to the first violation - which was a "completed" violation and thus falls under the probable cause standard - § 55-8-123(1) provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety." Tenn. Code Ann. § 55-8-123(1). The Sixth Circuit has held that "[b]oth this court and the Tennessee courts have found no violation of § 55-8-123, and therefore no probable cause [for the police to stop a vehicle], when a vehicle has veered from its lane but is not otherwise driving erratically." United States v. Gross, 550 F.3d 578, 583-84 (6th Cir. 2008) (citing cases). It is a close question, based on Deputy Kemp's testimony, whether Braden's crossing over the fog line twice could be considered "erratic" as contemplated by Gross. See Gross, 550 F.3d at 584 (holding that officer lacked probable cause to stop defendant's vehicle for violating § 55-8-123 where vehicle

traveling sixty-five miles per hour straddled center lane for over one hundred yards while changing lanes, rounding a curve, and going up a mountain); see also Guajardo, 388 F. App'x at 488 (finding officer's testimony to be credible regarding observing the defendant cross the fog line "several times," including one more time after defendant passed the officer, but also finding that officer had reasonable suspicion based on other facts that the driver was intoxicated). Unlike the officer in Guajardo, Deputy Kemp did not have reasonable suspicion that Braden was intoxicated, and the government does not contend otherwise.

However, even assuming, *arguendo*, that Deputy Kemp lacked probable cause to stop Braden's vehicle based on a violation of § 55-8-123, the court finds that Deputy Kemp was justified in stopping the vehicle based on his observation that Braden's front passenger window was excessively tinted, in violation of § 55-9-107(a)(1). That statute – a violation of which constitutes an "ongoing" violation and thus falls under the reasonable suspicion standard – provides that it is unlawful for any person to operate a motor vehicle in which any window has a visible light transmittance of less than 35%. In deciding whether an officer had reasonable suspicion to stop a vehicle for a traffic violation, the court must determine "whether, at the moment that they initiated the stop, the totality of the circumstances provided the officers with the reasonable suspicion required in order to detain a citizen

under <u>Terry</u>." <u>Feathers v. Aey</u>, 319 F.3d 843, 848–49 (6th Cir. 2003); <u>see also</u> <u>Arvizu</u>, 534 U.S. at 273 ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.") (internal quotation marks omitted). Here, the court finds that Deputy Kemp, who provided credible testimony about his personal observations, had reasonable suspicion to stop Braden's vehicle for violating § 55-9-107(a)(1). <u>See</u> <u>United States v. Shank</u>, 543 F.3d 309, 313 (6th Cir. 2008) (holding that officers had reasonable suspicion, based on their experience and estimation that vehicle was tinted substantially darker than permitted by law, to initiate traffic stop); <u>Weaver v. Shadoan</u>, 340 F.3d 398, 407–08 (6th Cir. 2003) (finding that vehicle stop was justified because officer had reasonable suspicion that vehicle had improperly tinted windows).

In addition to the traffic violation, the court finds that Deputy Kemp was justified in initiating the traffic stop based on Agent Scroggs's reasonable suspicion that Braden was involved in transporting drugs or drug proceeds from the Warehouse. "An investigative stop of a vehicle is permissible under the Fourth Amendment where the stop is supported by reasonable suspicion of wrongdoing." <u>United States v. Flores</u>, 571 F.3d 541, 544 (6th Cir.

2009) (citing Terry, 392 U.S. at 22 and United States v. Williams, 962 F.2d 1218, 1223-24 (6th Cir. 1992)).  The DEA investigation revealed that Braden played an active role in Taylor's drug trafficking organization, including possibly transporting drugs or drug proceeds when he left the Warehouse on July 9.  For example, during the investigation, agents intercepted numerous phone calls in which Braden was heard discussing drug trafficking activities with Taylor; Braden was seen in 2008 in Atlanta unloading boxes from a tractor trailer believed to be transporting marijuana and transporting the boxes to a rental house associated with Taylor; large amounts of cash were seized from tractor trailers that were seen leaving the Warehouse on two occasions; on July 9, Braden was heard on an intercepted call in which Taylor instructed Braden to go to the Warehouse; shortly before he was stopped, Braden was seen at the Warehouse driving the same blue Ford F-150 that Taylor had used on a previous occasion; and Braden was observed heading in the direction of Collier's residence.

The court recognizes that Deputy Kemp did not know what Agent Scroggs knew regarding Braden's suspected drug trafficking activities.  At the time Deputy Kemp initiated the traffic stop, all he knew was that the DEA wanted him to conduct a traffic stop of Braden's vehicle, and he believed that the stop was drug related because the request came from the DEA.  In United States v. Hensley, 469 U.S. 221 (1985), the Supreme Court addressed whether

-14-

officers of one police department could rely on information provided to them by another police department as the basis for an investigatory stop. In <u>Hensley</u>, a police officer from the Cincinnati suburb of St. Bernard distributed a "wanted flyer" to other police departments in the Cincinnati metropolitan area. <u>Id.</u> at 223. The flyer stated that the defendant, Hensley, was wanted for investigation of an aggravated robbery. It also provided information about Hensley and the alleged robbery, and requested that other police departments detain Hensley if he was located. <u>Id.</u> Two officers from the nearby town of Covington later saw Hensley and a passenger traveling in a vehicle. These officers were aware of the "wanted flyer" distributed by the St. Bernard police department, but did not know whether or not there was a warrant for Hensley's arrest, nor did they have any independent reason to believe that Hensley had committed a crime or was involved in criminal activity. Nevertheless, they proceeded to pull over Hensley's vehicle and investigate. During the stop, one of the officers recognized the passenger as a convicted felon, and multiple guns were discovered in the car. Both Hensley and his passenger were arrested. <u>Id.</u> at 224.

The Supreme Court reversed the appellate court's holding that the Covington officers had violated Hensley's Fourth Amendment rights. The Court held:

> if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that

the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information. If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment. . . . It is the objective reading of the flyer or bulletin that determines whether other police officers can defensibly act in reliance on it. Assuming the police make a <u>Terry</u> stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop, and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department.

<u>Id.</u> at 232-33 (internal citations omitted).

Based on <u>Hensley</u>, courts have held that the "collective knowledge" of other officers may be considered when determining whether an investigating officer had reasonable suspicion to conduct a <u>Terry</u> stop or probable cause to make an arrest. <u>See United States v. Bonilla</u>, 357 F. App'x 693, 702 n.1 (6th Cir. 2009) ("Reasonable suspicion can be based upon police officers' own observations or upon the collective knowledge of other officers.") (quoting <u>United States v. Braggs</u>, 23 F.3d 1047, 1049 (6th Cir. 1994)); <u>United States v. Kendricks</u>, 127 F. App'x 836, 843 (6th Cir. 2005) ("Many circuits, including our own, have determined that probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest.") (quoting <u>Collins v. Nagle</u>, 892 F.2d 489, 495 (6th Cir. 1989)); <u>United States v. Adams</u>, No. 09-20224, 2010 WL 3504072,

at *8 (E.D. Mich. Mar. 10, 2010) ("[I]n determining whether actions are proper, courts must evaluate the collective information of all the officers involved, including cooperating federal and local authorities.")

In United States v. Barnes, 910 F.2d 1342 (6th Cir. 1990), a federal law enforcement officer had briefed two Memphis police officers regarding Barnes, a gang member who was believed to be in the Memphis area. The briefing included information that Barnes was a convicted felon and armed at all times. The Memphis officers later encountered Barnes and pulled him over based on the information they had been provided at the briefing. The Sixth Circuit stated, "[a]pplying the Hensley rationale to this case, the question that must be answered is whether [the federal agent] would have had sufficient reasonable suspicion to justify a temporary stop of Barnes. We believe he would." Id. at 1344. The court found that the traffic stop was justified, despite the fact that the Memphis officers had no independent reason to suspect Barnes had committed a crime.

Similarly, in United States v. Adams, supra, a Michigan state trooper was on routine patrol when he received a communication from dispatch that the DEA was requesting assistance in conducting a traffic stop. The communication included a vehicle description and license plate number, and stated that the stop was for the purpose of seizing prescription narcotics. The state trooper later located

the vehicle, pulled over the suspect for a speeding violation, and searched the vehicle. The district court found that the state trooper "could defensibly act in reliance on that communication when stopping and searching Adams' vehicle." <u>Adams</u>, 2010 WL 3504072, at *11. The court found that the stop was justified because the DEA agent who requested the stop had probable cause to believe that the suspect's vehicle contained contraband. <u>Id.</u> at *12.

In one case, however, the Sixth Circuit found that the knowledge of one officer could not be imputed to the officer who initiated the traffic stop. In <u>United States v. Blair</u>, 524 F.3d 740 (6th Cir. 2008), two Knoxville police officers were patrolling (in separate squad cars) an area around a known drug house. One officer, Officer Munday, witnessed defendant Blair engage in what the officer believed to be a hand-to-hand drug transaction outside the house. However, Officer Munday did not believe he had probable cause to make an arrest. Blair then entered his vehicle, drove away, and rolled through a stop sign as he left. Officer Munday communicated to his partner (Officer Holmes), who was located a few blocks away, that Blair was leaving the drug house. Officer Munday did not tell Officer Holmes to pull Blair over, nor did he inform Officer Holmes of the possible drug transaction that he (Officer Munday) had witnessed. Nevertheless, the Officer Holmes stopped Blair's vehicle based on a tag-light violation. Afterwards, a

narcotics canine alerted to the vehicle, resulting in the officers finding illegal narcotics. Id. at 745-46. The Sixth Circuit found that the government could not justify the traffic stop based on reasonable suspicion derived from Officer Munday's observations, because Officer Holmes had stopped Blair based solely on a tag-light violation. In reaching this conclusion, the court found that Officer Munday "never communicated why Blair should be stopped, *or even that he should be stopped at all*. According to Officer Holmes, the only information he received prior to the stop was that a car was leaving the suspect house. As a result, Hensley does not apply." Id. at 752 (emphasis added). The court went on to note, however, that "[h]ad Officers Munday and Holmes decided together to stop Blair, information known only to Officer Munday would be relevant. Here, though, the officers did not make a collective decision to stop Blair, and thus Officer Munday's knowledge of the hand-to-hand transaction cannot be imputed to Officer Holmes." Id.

The present case is distinguishable from Blair. In Blair, the court rejected the government's attempt to justify the traffic stop based on reasonable suspicion of a drug transaction, because the officer who initiated the stop acted on his own, based solely on a traffic violation, and without any input from the officer who possessed the facts giving rise to the reasonable suspicion. In other words, an officer cannot initiate a Terry stop based on one ground, and then later justify the stop because it turned out that

-19-

another officer also happened to have another basis to conduct the stop.  Here, Agent Scroggs's request to have Deputy Kemp conduct a traffic stop of Braden's vehicle was, for all intents and purposes, tantamount to a collective decision to stop Braden.  It is clear that Agent Scroggs - who was following Deputy Kemp from a safe distance to avoid detection - could have conducted the traffic stop himself based on his personal knowledge of Braden's involvement in Taylor's drug organization.  The fact that he decided to enlist the assistance of Deputy Kemp, instead of conducting the stop himself and risking exposure of the undercover investigation, did not convert a lawful stop into an unlawful one.[12]

**B.    Whether the Degree of Intrusion was Reasonable**

Even if an initial stop is valid, an officer may impermissibly exceed the scope of the stop because "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." United States v. McColley, No. 3:09-00193, 2011 WL 253166, at *5 (M.D. Tenn. Jan. 25, 2011) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005) (internal quotation marks omitted)).  Under Terry, a stop must be reasonable in terms of scope and duration to the circumstances justifying the stop.  As stated by the Sixth Circuit:

_____

[12]Based on this finding, the court does not reach the issue of whether the officers also had probable cause to stop Braden's vehicle based on his drug trafficking activities.

> [t]o qualify as reasonable seizures under the Fourth Amendment, <u>Terry</u> detentions must be limited in both scope and duration. Under <u>Terry</u>'s duration prong, a stop must last no longer than is necessary to effectuate the purpose of the stop. Under its scope prong, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

<u>United States v. Everett</u>, 601 F.3d 484, 488-89 (6th Cir. 2010) (internal citations and quotation marks omitted). "To detain a motorist any longer than is reasonably necessary to issue the traffic citation, however, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct." <u>United States v. Aquilera-Pena</u>, 426 F. App'x 368, 370 (6th Cir. 2011) (quoting <u>United States v. Townsend</u>, 305 F.3d 537, 541 (6th Cir. 2002) (internal quotation marks omitted)).

In the present case, the court finds that both the scope and duration of the traffic stop were reasonably limited to the purpose of the stop. The duration of the stop was reasonably limited, especially given the fact that Nic made his positive alerts approximately only four and a half minutes into the stop, which as discussed below gave the officers probable cause to search the vehicle for drugs. The truck bed was opened and the marijuana was discovered only twenty minutes after the initial stop.[13] Moreover, upon approaching Braden, Deputy Kemp smelled alcohol and saw an

---

[13]The total elapsed time from the initial stop of Braden's vehicle to when he was formally arrested and driven away from the scene was approximately twenty-seven minutes.

open container of beer in the front cupholder (a violation of Tennessee's open container law), was told by Braden that he had been drinking, learned that the truck did not belong to him, noticed that Braden appeared nervous and his hands were shaking, and knew that the DEA wanted him stopped, presumably for drug-related reasons. These facts taken together provided Deputy Kemp with ample justification to further detain Braden to conduct his investigation.

In addition, it was objectively reasonable and within the scope of the stop for Deputy Kemp to ask Braden for his driver's license and insurance card, in order for him to conduct a records check. See Guajardo, 388 F. App'x at 489; see also United States v. Smith, 601 F.3d 530, 542 (6th Cir. 2010) ("Nor was it inappropriate for [the officer] to check both whether Williams and Garrett had valid identification and whether they had any outstanding warrants."); United States v. Bell, 555 F.3d 535, 541 (6th Cir. 2009) ("In a traffic stop, an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity would be well within the bounds of the initial stop.") (quoting United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999) (internal quotation marks omitted)); United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc) ("[A] motorist may be detained for a short period while the officer runs a background

check to see if there are any outstanding warrants or criminal history pertaining to the motorist even though the purpose of the stop had nothing to do with such prior criminal history."), abrogated on other grounds as stated in United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007); United States v. Garrido-Santana, 360 F.3d 565, 573-74 (6th Cir. 2004) (rejecting defendant's contention that reasonable suspicion was necessary to continue to detain driver after valid stop for speeding in order to complete computer check of driver's license even though citation for speeding had already been issued); United States v. Hill, 195 F.3d 258, 269 (6th Cir. 1999) (holding that driver's license check completed after citation for traffic offense had been issued was within original scope of traffic stop).

Also, Deputy Kemp did not exceed the scope of the stop by placing Braden in the backseat of the police vehicle while he conducted his records check. Deputy Kemp and Officer Moore never drew their weapons, ordered Braden to the ground, or placed him in handcuffs. On the video recording of the stop, Braden can be heard freely talking on his cell phone while sitting in Deputy Kemp's vehicle as the officers searched his truck. Additionally, Braden was in the police vehicle for only about one and a half minutes before Nic alerted to the presence of narcotics in the truck, at which time the officers then had probable cause to believe that Braden had drugs in his truck, which justified further detention of

Braden in the police vehicle while the two officers on the scene searched the truck. Under these circumstances, Braden's brief detention in the backseat of Deputy Kemp's vehicle was not unreasonable. See United States v. Williams, 238 F. App'x 566, 568 (11th Cir. 2007) ("we have held a stop is not necessarily transformed into an arrest because an officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down on the ground, or secures a suspect in the back of a patrol car.").

Finally, the officers did not exceed the scope of the stop by using Nic to check Braden's vehicle for narcotics. The use of the narcotics canine did not in any way prolong the stop, as it occurred while Deputy Kemp was still conducting the records check.

## C. Automobile Exception

As shown by the evidence, Nic is a certified narcotics canine and Officer Moore is trained in the handling of Nic. United States v. Stubblefield, No. 10-3587, 2012 WL 2290870, at *5 (6th Cir. June 19, 2012). Once Nic positively alerted to the tailgate area of the truck, the officers had probable cause that there were drugs in the truck and therefore were permitted to search the vehicle under the "automobile exception" to the Fourth Amendment. United States v. Diaz, 25 F.3d 392, 394 (6th Cir. 1994) (stating that an alert by a trained drug-detection dog "is sufficient to establish probable cause for the presence of a controlled substance"). "The requirements of probable cause are satisfied where the facts and

circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." United States v. Davis, 430 F.3d 345, 352 (6th Cir. 2005) (internal quotation marks and citations omitted). "Under the automobile exception to the warrant requirement, law enforcement officers may search a readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime." United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998) (citing United States v. Ross, 456 U.S. 798, 799 (1982)). This search may include all parts of a legitimately stopped vehicle, including the trunk and all containers. See Stubblefield, 2012 WL 2290870, at *5 ("If the police have probable cause to search a lawfully stopped vehicle for contraband, then the police have probable cause to search every part of the vehicle and all containers found therein in which the object of the search could be hidden."); United States v. Bailey, 407 F. App'x 27, 29 (6th Cir. 2011) (holding that strong smell of marijuana and marijuana found on the floorboard of the car on the driver's side provided "more than enough probable cause" to justify a search of the entire vehicle); United States v. Burns, 298 F.3d 523, 542 (6th Cir. 2002) ("Once the bag of crack cocaine was found in plain view, the officers had probable cause to believe that other contraband might be in the car."); United States v. Burnett,

791 F.2d 64, 67 (6th Cir. 1986) (holding that where a small bag of marijuana was found on the floorboard of the car, the officer "had every right to search the passenger area of the car, the trunk, and any and all containers which might conceal contraband").

## III.  RECOMMENDATION

For the reasons above, the court recommends that the motion to suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

July 6, 2012
Date

## NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**