**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

<table>
<tr><td>

UNITED STATES OF AMERICA,

    Plaintiff,

v.

EARL BRADEN,

    Defendant.

</td><td>

)
)
)
)
)
)
)
)
)
)
)

</td><td>

No. 2:11-cr-20192-JPM

</td></tr>
</table>

**ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND
DENYING DEFENDANT'S MOTION TO SUPPRESS**

Before the Court is Defendant Earl Braden's ("Defendant" or "Braden") Motion to Suppress (Docket Entry ("D.E.") 498), filed May 13, 2012. The Court referred the Motion to the Magistrate Judge for Report and Recommendation. (D.E. 516.) The Government filed a Response in Opposition to Defendant's Motion on May 17, 2012. (D.E. 514.) The Magistrate Judge held a hearing on June 25 and June 28, 2012. (D.E. 547, 555.) The Government called Drug Enforcement Administration ("DEA") Agent John "J.T." Scroggs ("Agent Scroggs") to testify regarding the facts surrounding his investigation, Shelby County Sheriff's Office ("SCSO") Deputy Jeff Kemp ("Deputy Kemp") to testify regarding the search in question, and Memphis Police Department ("MPD") Officer Jason Moore ("Officer Moore") to testify regarding the search. Defendant did not present any witnesses.

On July 6, 2012, the Magistrate Judge issued a Report and Recommendation ("Rep. & Rec.") (D.E. 563) recommending that the Motion be denied. The Defendant filed Objections to the Magistrate Judge's Report and Recommendation on July 18, 2012. ("Objections to Magistrate's Rep.") (D.E. 585.) The Government responded to the Defendant's Objections on July 23, 2012. (D.E. 587.) After de novo review of the record and of the parties' arguments, the Court ADOPTS the Magistrate Judge's Report and Recommendation and DENIES Defendant's Motion to Suppress.

## I. BACKGROUND

Defendant was indicted for conspiring to possess with the intent to distribute marijuana, in violation of 21 U.S.C. § 846. (Indictment (D.E. 1).) In the instant motion, Defendant seeks to suppress all evidence obtained as a result of the search of his Ford F-150 pickup truck in June 2011. (Mot. to Suppress 1.) Specifically, Defendant moves to suppress the marijuana seized from the truck, on grounds that the officers violated his Fourth Amendment rights by initiating the traffic stop without probable cause or reasonable suspicion, and by unreasonably prolonging the stop. (Id. at 2.)

Defendant does not object to the Magistrate Judge's proposed findings of fact. (Objections to Magistrate's Rep. 2.) Therefore, the Court ADOPTS the Magistrate Judge's proposed findings of fact and incorporates them herein:

2

DEA Agent John Scroggs first became aware of Earl Braden in or around May 2008, when he was asked to assist in a drug investigation in the Atlanta, Georgia area involving a narcotics organization headed by an individual named Vernon Taylor. Information obtained from an investigation indicated that marijuana was going to be transported to a warehouse in a tractor trailer by members of Taylor's organization. Agent Scroggs conducted surveillance of the tractor trailer and observed an individual, later identified as Earl Braden, unloading boxes from the trailer to a vehicle registered to Braden. Braden was observed driving the vehicle to a rental house associated with Taylor.

In 2011, the DEA began an investigation involving marijuana trafficking by Taylor's organization in the Memphis, Tennessee area. The investigation involved wire taps, surveillance, telephone toll analyses, and an interview with a confidential informant who was a former member of Taylor's organization. During the investigation, numerous phone conversations between Braden and Taylor were intercepted, which Agent Scroggs believed related to the trafficking of illegal narcotics.

On April 30 and May 1, 2011, agents intercepted calls among members of Taylor's organization that indicated narcotics would be delivered to the Kuehne Nagel warehouse in Memphis (the "Warehouse"). Agents then conducted surveillance of the Warehouse, where they observed a tractor trailer arrive and back up to a loading bay. Although the agents could not see what was happening inside the loading area, they observed pick-up trucks coming and going from the Warehouse. During an intercepted call on May 1, Taylor spoke with a member of the organization, Barry Collier, and discussed the price per pound of the marijuana that was delivered. Taylor also called Tony

Stephenson, another member of the organization, and discussed the drugs that had arrived and that the process had gone smoothly. They also discussed whether Taylor had checked the quality of the drugs.[1]

On May 12, 2011, calls were intercepted involving Taylor and members of the organization, in which they discussed another delivery of marijuana in a tractor trailer. Agents conducted surveillance of the Warehouse and observed a tractor trailer arrive at that location. Agents observed several members of the organization at the Warehouse, and the agents could hear loud noises coming from inside the trailer. During this time, agents observed Taylor arrive at the Warehouse in a blue Ford F-150 pickup truck.[2] After the tractor trailer left the Warehouse, agents followed it to Dyersburg, Tennessee, at which time it was stopped by law enforcement officers. A search of the trailer uncovered a hidden compartment storing $635,427.00 in cash.

On May 16, 2011, agents intercepted a call between Taylor and Braden, in which Taylor told Braden to meet with Roderick Mathis, another member of the organization, at a house rented by Taylor on Castlegate Street. Taylor told Braden to go to the house, pick up a vehicle, and make a delivery (believed to be marijuana) to the "Old Man" (believed to be Collier). Agents observed Braden arrive at the Castlegate residence and leave the location in a truck. Agents asked MPD officers to conduct a traffic stop of the truck to identify the driver. Officers ran the license plate information on the truck and discovered that the license plate did not belong to the truck. Based on this, the officers initiated a traffic stop and were able to identify the

---

[1] Agents observed Stephenson at the Warehouse on May 1.

[2] As discussed later, this was the same truck that Braden was driving on July 9, 2011, when he was pulled over by law enforcement.

driver as Braden. Afterwards, agents
intercepted a call between Taylor and
Braden, in which Braden told Taylor about
being stopped by the officers.

On June 9, 2011, agents intercepted a
call between Taylor and Braden, in which
Braden stated that he was ready to "work."
Taylor indicated that another shipment would
be arriving soon. On June 11, calls were
intercepted indicating that tractor trailers
would be arriving at the Warehouse. Agents
conducted surveillance and observed two
tractor trailers arrive at the Warehouse at
different times. Braden was seen at the
Warehouse while one of the tractor trailers
was being unloaded. Agents followed the
second tractor trailer to Texarkana, Texas,
and during a Level II inspection of the
trailer at a weigh station, $998,014.00 in
cash was found hidden inside hollow areas of
doors that were being transported in the
trailer.

On July 9, 2011, agents intercepted
calls by members of Taylor's organization
which indicated that another shipment of
narcotics was going to be delivered to the
Warehouse. A call was intercepted between
Taylor and Stephenson, in which Stephenson
stated that there were 69 "shoulder pads"
and asked Taylor how they should be
separated. Taylor stated that the packages
should be separated according to the
initials on the packages. A call was
intercepted between Taylor and Braden, in
which Taylor told Braden to go to the
Warehouse and that they were ready for him.

On that same day, agents conducted
surveillance of the Warehouse and observed a
tractor trailer arrive and back up to the
loading bay. Agents observed Braden arrive
in a blue F-150 truck, which was the same F-
150 driven by Taylor on May 12 when he was
seen at the Warehouse. Within a few minutes,
Braden left the Warehouse. Agent Scroggs

initially followed Braden's vehicle from the Warehouse, but then he contacted Deputy Kemp with the Interstate Criminal Interdiction Task Force ("ICI Task Force") and asked for assistance in conducting a traffic stop of Braden's truck.[3] Deputy Kemp was not provided with any specific information about why Agent Scroggs wanted Braden pulled over, but Deputy Kemp believed that the reason was drug related because the request came from the DEA. Assisting Deputy Kemp was MPD Officer Moore (also a Task Force member), who was in a separate police vehicle and accompanied by his narcotics canine.

Deputy Kemp followed behind Braden's vehicle, which was traveling on a street with multiple lanes of traffic. Braden's vehicle was in the right-hand lane. Deputy Kemp observed Braden swerve out of his lane of traffic twice, by crossing over the white "fog" line separating the lane of travel from the shoulder. He also observed that the front passenger's window, which was partially rolled down, had window tint that was too dark, in violation of Tennessee law. Based on these two traffic violations, Deputy Kemp activated his blue lights and initiated a traffic stop.[4] Deputy Kemp approached the driver's side and asked to see Braden's driver's license. He also asked

---

[3] Based on intercepted calls, Agent Scroggs believed that Braden was making a delivery of marijuana to Collier. Braden was later stopped at a location less than one mile from Collier's residence.

[4] The only material discrepancy in the witnesses' testimony related to whether Deputy Kemp stopped Braden based on a seatbelt violation. Agent Scroggs testified that he believed Deputy Kemp initiated the traffic stop based on a seatbelt violation, whereas Deputy Kemp testified that he could not see whether or not Braden was wearing a seatbelt. Deputy Kemp further testified that he pulled over Braden based on the other traffic violations. On this issue, the court credits the testimony of Deputy Kemp over the testimony of Agent Scroggs, as Deputy Kemp was the officer who actually initiated the traffic stop, and his testimony regarding the basis of the stop is consistent with the video evidence and his arrest report. Agent Scroggs, on the other hand, was not an active participant in the traffic stop, and thus had no first-hand knowledge of the events surrounding the stop. Instead, Agent Scroggs followed Deputy Kemp from a safe distance and once he observed Deputy Kemp initiate the traffic stop, Agent Scroggs left the scene and pulled into a gas station to avoid being detected by Braden.

Braden if the truck belonged to him and if he had "papers" for the vehicle. Braden handed over his license and insurance card, and stated that the truck belonged to a friend.[5] As Deputy Kemp was talking to Braden, he detected the smell of alcohol and saw in the front cupholder an open container of beer. He asked Braden if he had been drinking, to which Braden responded that he had consumed half a cup of beer. Deputy Kemp observed that Braden's hands were shaking and he appeared very nervous. Deputy Kemp told Braden that he saw him cross over the fog line "a couple of times." Deputy Kemp directed Braden to step out of the truck, at which time he patted Braden down for weapons. After he determined that Braden did not have any weapons, Deputy Kemp placed Braden in the backseat of his police vehicle. According to the elapsed time displayed on the dashboard recording of the traffic stop, Braden was placed in the back of the police vehicle without handcuffs approximately three minutes after Deputy Kemp activated his blue lights and initiated the traffic stop. After Braden was placed in the backseat, Deputy Kemp began running a records check through BLOC, a law enforcement database.[6]

Approximately one minute later, Officer Moore (who was parked behind Deputy Kemp) escorted his narcotics canine, "Nic," to the truck.[7] Within seconds, Nic gave multiple positive alerts to the rear tailgate area of the truck. Nic gave his positive alerts well before Deputy Kemp completed his records check. Over the next several minutes, Deputy

---

[5] It is undisputed that Braden was not the owner of the truck. However, the government does not challenge Braden's "standing" to challenge the initial traffic stop or search of the vehicle.

[6] Deputy Kemp informed Braden that the insurance card had expired in 2008.

[7] Nic has been certified as a narcotics canine since 2008, and has been recertified each year since then. Nic has been trained to sit when he detects the odor of four types of drugs - marijuana, cocaine, heroin, and methamphetamine. Officer Moore has also received specialized training in the handling of Nic through the MPD.

Kemp and Officer Moore attempted to access
the truck bed by lifting the topper that
covered the truck bed. Although the topper
was locked, the officers were able to lift
the topper slightly and slide a small video
camera that was attached to a wire into the
truck bed area. The video camera showed
packages that appeared to be marijuana
inside the truck bed. Afterwards, the
officers were able to access the truck bed
by pushing up on the topper and pulling down
on the unlocked tailgate.[8] They found twenty-
seven packages in the truck bed, totaling
approximately 746 pounds of marijuana. After
Braden's truck was towed from the scene,
testing was conducted on the window tint,
which showed that the tint had a visible
light transmittance of 4%, well below the
minimum 35% required by Tennessee law.

Braden, along with Taylor, Stephenson,
Bowens, Collier, and twenty-one other
individuals, were subsequently indicted for
conspiring to posses with the intent to
distribute marijuana, in violation of 21
U.S.C. § 846. In the present motion, Braden
moves to suppress the marijuana seized from
the truck, on grounds that the officers
violated his Fourth Amendment rights by
initiating the traffic stop without probable
cause or reasonable suspicion, and by
unreasonably prolonging the stop.

(Rep. & Rec. 2-9.)

## II. STANDARD OF REVIEW

"A district judge must determine de novo any part of a
magistrate judge's disposition that has been properly objected
to." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C). After
reviewing the evidence, the Court is free to accept, reject, or

---

[8] This occurred approximately twenty minutes after Braden was initially
stopped.

modify the proposed findings or recommendations of the
Magistrate Judge. 28 U.S.C. §636(b)(1)(C). The Court is not
required to review those aspects of the report and
recommendation to which no objection has been made. Thomas v.
Arn, 474 U.S. 140, 150 (1985). The Court should adopt the
findings and rulings of the Magistrate Judge to which a party
files no specific objection. Id.; United States v. Walters, 638
F.2d 947, 950 (6th Cir. 1981).

## III. ANALYSIS

The Magistrate Judge recommended that Defendant's Motion to
Suppress be denied. (Rep. & Rec. 26.) In doing so, the
Magistrate Judge recommended the following conclusions of law:
(1) that Deputy Kemp and Officer Moore had a proper basis for
the traffic stop; (2) that the scope and duration of the traffic
stop were reasonably limited to the purpose of the stop; and (3)
that the officers had probable cause to search the vehicle under
the "automobile exception" to the Fourth Amendment. (Rep. &
Rec. 13, 21, 24.)

### A. Defendant's Objections to Conclusions of Law

Defendant raises three objections to the Magistrate Judge's
proposed conclusions of law: (1) Deputy Kemp did not have
reasonable suspicion that Defendant's vehicle was being used for
criminal activity; (2) the proper standard to apply here is
probable cause, not the lesser reasonable belief standard, and

Deputy Kemp did not have probable cause to believe there was any criminal activity when he placed Defendant in the squad car; and (3) the duration of the stop was unreasonably prolonged. (Objections to Magistrate's Rep. 4, 9.)  The Court will address each objection in turn.

### 1.    Whether Deputy Kemp had reasonable suspicion

Defendant objects on the ground that Deputy Kemp did not have reasonable suspicion to effect a traffic stop based on Agent Scrogg's suspicion that Defendant's vehicle was involved in transporting drugs, because Agent Scroggs stated on cross-examination that he had only a "hunch or suspicion" that the Ford F-150 contained drugs.  (Objections to Magistrate's Rep. 3.)  This implicates the standard required to justify an investigatory stop for traffic violations.

Defendant does not object to the Magistrate Judge's summary of the current state of the law on this issue.  (Objections to Magistrate's Rep. 3-4 ("The defendant agrees with the magistrate judge that the police may stop a vehicle based upon reasonable suspicion of criminal activity, rather than upon the stricter standard of probable cause").)  Accordingly, the Court incorporates by reference that discussion of the law.  (Rep. & Rec. 9-20.)

Defendant objects to the Magistrate Judge's conclusion that "Deputy Kemp was justified in initiating the stop based on Agent

Scroggs' reasonable suspicion that Braden was involved in transporting drugs or drug proceeds from the Warehouse." (Rep. & Rec. 13.) Defendant argues that "there is not much to connect Defendant Braden with [illegal drug activity] noticed through surveillance." (Objection's to Magistrate's Rep. 2.) Defendant contends that the trailers from which $653,427.00 and $998,014.20 were seized "had no connection with Braden." (Id.) Defendant argues that the fact that at one point Taylor drove the Ford F-150 truck which Braden was driving when he was stopped had "no meaningful probative value as there is no testimony that [the] Ford F-150 was earlier involved in any criminal activity." (Id.) Defendant further contends that the fact that in 2008 Defendant was found unloading boxes in Atlanta from a tractor trailer "should have no bearing on the probable cause determination by [O]fficer Kemp or Agent Scroggs." (Id.) Defendant alleges that there was nothing in the call intercepted on July 9, 2011, to link Braden or his vehicle to narcotics. (Id. at 3.) Finally, Defendant argues that because Agent Scroggs stated on cross-examination that he had a hunch or suspicion that the Ford F-150 had drugs in it when it left the Warehouse on July 9, 2011, "there was no probable cause to believe that the Defendant was involved in any criminal activity on July 10, 2012." (Id.)

As a preliminary matter, the Court notes that the Magistrate Judge first concluded that the officers had justification independent from drug activity sufficient to effect a traffic stop. The Magistrate Judge explained that in the Sixth Circuit, probable cause is required to justify an investigatory stop for completed misdemeanor traffic violations, whereas an investigatory stop for ongoing violations requires only reasonable suspicion. (Rep. & Rec. 10 (citing United States v. Guajardo, 388 F. App'x 483, 487 (6th Cir. 2010).) The Magistrate Judge found that Deputy Kemp stopped Braden's vehicle for two traffic violations: (1) swerving out of his lane of traffic twice, in violation of Tenn. Code Ann. § 55-8-123(1); and (2) operating a vehicle with window tint that had visible light transmission of less than 35%, in violation of Tenn. Code Ann. § 55-9-107(a)(1). (Rep. & Rec. 11.) The Magistrate Judge explained that the first was a completed violation, while the second was an ongoing violation. (Id. at 11-12.) The Magistrate Judge stated that the ongoing violation of the window tint fell under the reasonable suspicion standard and held that Deputy Kemp had reasonable suspicion to stop Defendant's vehicle for violating § 55-9-207(a)(1). (Id. at 12-13.) Based on these facts alone, Deputy Kemp had reasonable suspicion sufficient to justify an investigatory stop of Defendant's vehicle.

The Magistrate Judge further concluded that, in addition to the traffic violation, Deputy Kemp was justified in initiating the traffic stop based on Agent Scroggs's reasonable suspicion that Defendant was involved in transporting drugs or drug proceeds. In contrast to Defendant's argument that "there was no probable cause to believe that the Defendant was involved in any criminal activity on July [9], 2011," Objections to Magistrate's Rep. 3, the correct standard is reasonable suspicion. "The Fourth Amendment forbids law enforcement officers from making unreasonable searches and seizures, 'and its protections extend to brief investigatory stops of . . . vehicles that fall short of traditional arrest.'" United States v. Luqman, 522 F.3d 613, 616 (6th Cir. 2008) (quoting United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)). In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity. Gaddis ex rel. Gaddis v. Redford Twp., 364 F.3d 763, 771 n.6 (6th Cir. 2004). "[T]he pertinent Fourth Amendment framework for the initial stop is therefore the reasonable suspicion standard." United States v. Lyons, ___ F.3d ___, 2012 WL 3023528, at *5 (6th Cir. July 25, 2012).

Reasonable suspicion requires "more than an ill-defined hunch." United States v. Richardson, 385 F.3d 625, 630 (6th

Cir. 2004). It must be "based on a particularized and an objective basis for suspecting the particular person of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). A court must consider the totality of circumstances when determining whether an officer had reasonable suspicion of criminal activity. Id. The evidence offered in support of reasonable suspicion is viewed using a common sense approach. Richardson, 385 F.3d at 630 (citations omitted).

Here, the Court finds that the ongoing DEA investigation furnished reasonable suspicion for the traffic stop that resulted in the seizure of marijuana from Defendant's vehicle. On the date of Defendant's arrest, Agent Scroggs had been investigating the Taylor organization for several years. The investigation in the Memphis area resulted in multiple intercepted phone calls and surveillance in the months preceding the traffic stop. In particular, surveillance revealed Taylor driving the blue Ford F-150 pickup truck Braden was driving on July 9, 2011, when he was stopped. An intercepted phone call between Braden and Taylor revealed that Taylor told Braden to meet with another member of the organization, go to a house rented by Taylor, pick up a vehicle, and make a delivery (believed to be marijuana). Braden was subsequently stopped by officers. In a later intercepted call between Taylor and Braden, Braden told Taylor about being stopped. On June 9,

2011, agents intercepted a call between Taylor and Braden in which Braden stated that he was ready to "work," and Braden was later seen at the Warehouse associated with Taylor's drug organization.  On July 9, 2011, agents intercepted phone calls by members of Taylor's organization regarding another shipment of narcotics to the Warehouse, including a phone call between Taylor and Braden in which Taylor told Braden to go to the Warehouse and that they were ready for him.  Agents conducting surveillance on the Warehouse observed Braden arrive in a blue Ford F-150 truck.  After Braden left the Warehouse, Agent Scroggs initially followed Braden, and then contacted Deputy Kemp for assistance.

At the suppression hearing, Agent Scroggs articulated clear and specific facts to support his suspicion.  Agent Scroggs explained that Braden was present at the Warehouse, had run errands and delivered narcotics for Taylor, and frequently discussed narcotics with Taylor over the telephone.  Agent Scroggs testified that, based on the surveillance and the telephone calls the DEA received, it believed that Braden was transporting narcotics with intent to deliver them to a specific individual.

Considering the events of July 9, 2011, given the DEA's lengthy investigation of the Taylor organization and Braden's role in it, Agent Scroggs possessed a reasonable and

particularized suspicion to believe that Defendant left the Warehouse in possession of drugs or drug proceeds. The circumstances were suspicious when considered in context of the DEA's prior knowledge.

The Court also notes that Defendant appears to challenge the Magistrate Judge's conclusion of law that collective knowledge of other officers may be considered when determining whether an investigating officer had reasonable suspicion to conduct a Terry stop or probable cause to make an arrest. (See Rep. & Rec. 16-20.) The Magistrate Judge cited United States v. Hensley, 469 U.S. 221 (1985), for the proposition that reasonable suspicion may be based on collective knowledge of other officers. (Id.) Defendant argues that "[i]n establishing probable cause the Magistrate relied on Hensley, on the collective knowledge of the officers. Here there was no knowledge that was passed on by agent Scroggs." (Objections to Magistrate's Rep. 7.) The Court first notes that the Magistrate Judge cited Hensley in his discussion on reasonable suspicion, not probable cause. (Rep. & Rec. 20 n.12 ("Based on this finding, the court does not reach the issue of whether the officers also had probable cause to stop Braden's vehicle based on his drug trafficking activities").) Further, Defendant's argument ignores the Magistrate Judge's citation to United States v. Adams, No. 09-20224, 2010 WL 3504072 (E.D. Mich. Mar.

10, 2010), in which a Michigan state trooper received communication that the DEA was requesting assistance in conducting a traffic stop.  The communication involved a vehicle description and license plate number, and stated that the stop was for the purpose of seizing narcotics.  The trooper located the vehicle, pulled the driver over for a speeding violation, and searched the vehicle.  The district court found that the state trooper "could defensibly act in reliance on that communication when stopping and searching Adams' vehicle."  2010 WL 3504072, at *11.  The court found that the stop was justified because the DEA agent who requested the stop had probable cause to believe that the suspect's vehicle contained contraband.  <u>Id.</u> at *12.

The facts of <u>Adams</u> are substantially similar to the facts in this case.  Although in the instant case Deputy Kemp was not explicitly informed that the purpose of the stop was to seize narcotics, he was aware that the directive to conduct the stop came from the DEA, and consequently he inferred that the stop was drug-related.  (<u>See</u> Rep. & Rec. 14.)  Defendant has not shown that the reasoning in <u>Adams</u> should not apply in the instant case.  The Court holds that Deputy Kemp, in forming reasonable suspicion to stop Defendant, could rely on the knowledge of Agent Scroggs.

The Court therefore ADOPTS the Magistrate Judge's proposed conclusions of law as to this point.

**2. Whether Defendant was under arrest requiring probable cause when he was placed in the squad car**

Defendant objects on the ground that he was placed under arrest when he was placed in the back of Deputy Kemp's squad car and the arrest was not supported by probable cause. (Objections to Magistrate's Rep. 4.) Defendant argues that Deputy Kemp exceeded the bounds of the Terry stop when he detained Defendant in the squad car "without taking any actions to complete the traffic stop." (Id.) Defendant contends that when he exited his truck, probable cause to arrest him did not exist, and thus when Deputy Kemp placed him in the squad car, "the illegal arrest was complete." (Id. at 5.) The critical issue is whether reasonable suspicion or probable cause was required to place Defendant in the squad car. Defendant is incorrect that this action required probable cause; all that was required was reasonable suspicion.

As explained supra, Deputy Kemp had reasonable suspicion of criminal activity sufficient to effect a traffic stop. The Fourth Amendment's protections against unreasonable searches and seizures "'extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.'" United States v. Luqman, 522 F.3d 613, 616 (6th Cir. 2008) (quoting United

18

States v. Arvizu, 534 U.S. 266, 273 (2002)). Nonetheless, if a law enforcement officer has reasonable suspicion that criminal activity is afoot, the officer may conduct a brief traffic stop for investigative purposes to confirm or dispel his suspicions. Terry v. Ohio, 392 U.S. 1, 30–31 (1968). Reasonable suspicion "requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a Terry stop." Dorsey v. Barber, 517 F.3d 389, 395 (6th Cir. 2008) (internal quotation marks and citation omitted).

"Once a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a Terry stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." United States v. Carr, 674 F.3d 570, 574 (6th Cir. 2012) (citing United States v. Campbell, 486 F.3d 949, 954 (6th Cir. 2007)) (once officer asks defendant to exit his vehicle, encounter transforms from voluntary to compulsory; seizure was constitutional because defendant's furtive movements and presence of contraband in vehicle provided reasonable suspicion that defendant was

engaging in illegal activity).  Here, when Deputy Kemp approached Defendant, Deputy Kemp smelled alcohol, saw an open container of beer in the front cupholder in violation of Tennessee's open container law, was told by Defendant that he had been drinking, was informed by Defendant that the truck did not belong to him, observed Defendant's nervous behavior and shaking hands, and knew that the DEA wanted him stopped.  Taken together, these facts provided Deputy Kemp with reasonable suspicion of criminal activity to detain him further.

The issue then is whether placing and detaining Defendant in the squad car must be supported by probable cause.  The Court notes that Defendant was detained in the squad car for only one and a half minutes before the canine alerted to the presence of narcotics in the truck, giving the officers probable cause to detain Defendant further.  The Court holds that the minute and a half during which Defendant was in the squad car before the canine alerted was not an arrest that must be supported by probable cause; rather, Deputy Kemp needed only reasonable suspicion.

In <u>United States v. Hood</u>, 978 F.2d 1260, 1992 WL 322373 (6tth Cir. 1992) (table), a Memphis police officer stopped a vehicle he suspected was involved in a drug transaction.  1992 WL 322373 at *1.  When the officer asked the driver who the car belonged to, the driver replied he did not know.  <u>Id.</u>  The

driver also lied about the identity of his passenger, who appeared very nervous.  Id.  Fearing the vehicle was stolen, the officer placed both driver and passenger in the back of his patrol car.  Id.  Defendants filed a motion to suppress, claiming that the officer had unlawfully seized them when he stopped the car and arrested them without probable cause by placing them in the back of the patrol car.  Id. at *2.  The Sixth Circuit first noted that an officer who makes a valid investigatory stop may briefly detain those he suspects of criminal activity to verify or quell that suspicion.  Id. at *3 (citing United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990)).  The court then explained that the detention must be reasonably related in scope to the circumstances which justified the inferences in the first place.  (Id.)  The court held that the officer acted lawfully in placing the defendants in his patrol car because the defendants acted nervously and the officer suspected the car might be stolen.  (Id.)  In so reasoning, the court stated that "plac[ing] [defendants] in the back of a locked patrol car . . . does not, per se, require probable cause."  (Id. at *4 (citing United States v.. Parr, 843 F.2d 1228, 1230 (9th Cir. 1988)).  The court specifically noted that the officer did not raise his voice, handcuff the suspects, or tell them that they were under arrest.  (Id.)  The court

found that the defendants' inability to leave did not convert the stop into a de facto arrest. (Id.)

In the instant case, Defendant is incorrect that placing him in the patrol car required probable cause. The detention required only reasonable suspicion to be valid. Deputy Kemp observed that Defendant appeared nervous, admitted that he had consumed alcohol, and was in possession of an open container of beer in violation of Tennessee law. The facts provided reasonable suspicion to detain Defendant for a brief period of time while Deputy Kemp ran a records check. Nor did the minute and a half during which Defendant was in the squad car before the canine alerted convert the detention into an arrest. Like the officer in Hood, Deputy Kemp did not raise his voice, handcuff Defendant, or inform him that he was under arrest. Defendant was simply not under arrest, and Deputy Kemp's detention of Defendant required only reasonable suspicion. The Court therefore ADOPTS the Magistrate Judge's proposed conclusions of law as to this point.

**3. Whether the duration of the stop was unreasonably prolonged**

Defendant objects on the ground that Deputy Kemp unreasonably prolonged the investigative stop because he could have written a citation for crossing the fog line or for having tinted windows. (Objections to Magistrate's Report 6, 9.)

Defendant argues that the Magistrate Judge erroneously concluded that the window tint violation was an ongoing violation because Deputy Kemp could have written a citation for the violation. (Id. 6.)

Defendant's arguments are without merit. Defendant does not cite to any law requiring Deputy Kemp to have written a citation or how writing a citation would preclude the finding of an ongoing violation. Further, he has not offered any argument to challenge the Magistrate Judge's finding that it was "objectively reasonable and within the scope of the stop for Deputy Kemp to ask Braden for his driver's license and insurance card, in order for him to conduct a records check." (Rep. & Rec. 22) (citing cases holding that an officer may lawfully detain a driver while running a records check). The Court therefore ADOPTS the Magistrate Judge's recommended conclusions of law as to this point.

**IV. CONCLUSION**

For the foregoing reasons, upon de novo review, the Court ADOPTS the Magistrate Judge's Report and Recommendation. Defendant's Motion to Suppress is DENIED.

**IT IS SO ORDERED,** this 16th day of August, 2012.

/s/ JON PHIPPS McCALLA
CHIEF UNITED STATES DISTRICT JUDGE